May it please the Court, Eliza McDuffie proclaims of appellant Michael Johnson. For months and years at a time, Michael Johnson was denied the ability to exercise outside of himself. As a result, for the vast majority of a three-and-a-half-year period, he was trapped for 24 hours a day, seven days a week, in a room the size of a parking space. To make matters worse, that cell, which amounted to a sensory deprivation chamber, was often covered in feces, reeked of sewage, or was dangerously hot. All the while, Mr. Johnson was suffering from mental illness so debilitating that the IBOC and its mental health providers designated him seriously mentally ill. The defendants in this case violated the Constitution in two ways. First, both sets of defendants inflicted cruel and unusual punishment on Mr. Johnson by denying him out-of-cell exercise for months and years at a time. Second, the Wexford defendants denied Mr. Johnson constitutionally adequate health care by repeatedly refusing to provide heightened mental health treatment and instead persisting for years for the course of treatment they knew to be ineffective. I'd like to begin with the conditions claimed. The record of summary judgment plainly shows that the defendants subjected Mr. Johnson to a profoundly troubling cycle of punishment that they knew would aggravate his serious mental illness and predictably did cause him to decompensate before their eyes. Defendants repeatedly denied Mr. Johnson, a seriously mentally ill prisoner, the ability to exercise outside of his cell while simultaneously holding him apart from other humans in solitary confinement in a small box. And they did this despite the fact that out-of-cell exercise is required as a tool to manage serious mental illness. And this is clear from this court's case law, like Delaney, where this court said that exercise is an indispensable component of preventative medicine and is no longer considered an optional form of recreation but is instead required for mental well-being. This is also clear from the IBOC's own mental health protocol, which says that to prevent suicide for mentally ill prisoners like Mr. Johnson, a healthy lifestyle is required to include exercise. Ms. McDuffie, this is Judge Easterbrook. I'm wondering whether the sort of argument you are now making... I'm sorry, do we have some cross-talk here? I can hear you, Judge Easterbrook. Yeah. Ms. McDuffie, I'm wondering whether the sort of argument you are now making was made in the district court. The appellees say that in the district court, Johnson's argument concerned the conditions in his cell, such as whether it was too hot, rather than the length, total length of solitary confinement or the amount of outside exercise. That argument doesn't appear to be repeated on appeal. So, I wonder what's been preserved for our decision. Your Honor, the challenge in this case and the challenge that Mr. Johnson brought into the case, though it may not be the model of clarity, is the challenge to the denial of out-of-cell exercise. But in order for this court to determine whether that denial violates the amendment in this case, it has to be out-of-cell exercise for months and years at a time. And in this case... Counsel, counsel, the question I am asking is whether the argument you are now making was made in the district court. I'm not asking you to elaborate on the argument you're making in the court of appeals. I'm trying to figure out whether it was preserved. It was preserved, Your Honor. The undeniable gist of Mr. Johnson's complaint is exactly the argument that I just laid out. So, Mr. Johnson says in his complaint, he complains of being denied out-of-cell exercise. And then he says, I am in a cell 24 hours a day, seven days a week. And he talks about what the condition in that cell is like. And he talks about how that has caused his mental illness, predictably, to deteriorate. So, again, his pleadings may not be the model of clarity. He's a pro se, seriously mentally ill prisoner who begged for an attorney multiple times. But the undeniable gist of what he argued before the district court is precisely the argument we're pressing today on appeals. And I'd like to turn to exactly how the denial of out-of-cell exercise in this case affected Mr. Johnson. Predictably, when Mr. Johnson was denied the out-of-cell exercise that we would submit is necessary to manage his mental illness, he predictably deteriorated. He was severely depressed. He tried to commit suicide multiple times. And he said that his depression immobilized him. He said in his deposition, he gave a description of what the worsening mental state was like. He said, I gave up on life. I would wake up in the morning. I was urinating on the floor. I would defecate on myself. I would rub feces all over the cell, all over my body. And these were things I would do on a daily basis. This is the picture of an extremely mentally ill person who is decompensating. And the evidence at summary judgment is that this decompensation... Decompensation may be a word known to psychiatrists, but it's not a word known to me. I apologize, Your Honor. Mr. Johnson's mental illness was aggravated and his condition worsened. And we can infer on this record at summary judgment that Mr. Johnson, the aggravation of his mental illness and his continuing worsening condition was caused by the denial of out-of-cell exercise. Now, we can see this in a few ways. So, first of all, Mr. Johnson grieved multiple times that being denied out-of-cell exercise greatly affected his mental illness for the worse. He said that it increased his panic attacks and anxiety. And he said that being denied out-of-cell exercise... evidence in the record. Is there any medical evidence in the record about how much out-of-cell time is necessary? Your Honor, there's medical evidence in the record that because Mr. Johnson was not receiving out-of-cell time, that he was decompensating. Or, excuse me, that his mental condition was worsening. So, for example, we have defendant Moss back in 2014 saying that because Mr. Johnson was denied yards, he had no outlet for his mania. And we see throughout the record that mental health defendants in this case are observing his worsening condition. We see that Mr. Johnson says to defendant Moss, and she records this in her record... Counsel, I wish you would address my question as directly as possible. Is there any medical expert evidence in this record about the effect of not having particular amounts of out-of-cell time? For example, the effects of being out-of-the-cell one hour a day versus one hour a week, one day a month. It's observing that somebody's mental health is bad. It seems to me different from having medical expert evidence. Your Honor, what we have in the record is Mr. Johnson's cite to the case Davenport v. DiRoberto where the IBOC doctor in that case... Counsel, please, would you address my question? Does the record contain such evidence? The fact that somebody cites a case is not medical evidence. The answer is yes or no, and if no, you can tell me what you think the significance of that is. But pointing out that somebody cited a case doesn't help me figure out whether there was medical expert evidence. Your Honor, I don't believe that I can say that there is specific expert testimony or evidence in this case about exactly how much denial, what amount of denial causes what kind of worsening conditions. But we do have in this record certainly enough for a jury to infer that the denial in this case caused Mr. Johnson's mental illness to worsen. And we have enough in this case for a jury to determine that the defendants knew that was the case and were deliberately indifferent to that fact. And I'd like to give a few examples of how we can see that the defendants in this case were deliberately indifferent. So first, we have Mr. Johnson's grievances. And as this Court said internally, grievances are sufficient to establish subjective knowledge. And the grievances in this case actually show specific evidence that the defendants were aware of Mr. Johnson's worsening condition. As just one example, we have Defendant Melvin on two occasions marking grievances as non-emergency where Mr. Johnson said that denial of out-of-cell exercise was making him depressed and increasing his anxiety. Another example that we have is that Johnson told them. He grieved that he told Defendants Moss and McCormick about his deteriorating mental state due to the out-of-cell exercise restriction on numerous occasions but that his words went unacknowledged. And we also in this case have visible manifestations of his worsening condition. Mr. Johnson was acting just as one would expect a seriously mentally ill prisoner subjected to these kinds of conditions to act. He was smearing feces all over his body and all over the cell. He was suicidal. And so on this record, the inference, the only inference on this record of summary judgment is that the defendants were aware of the fact that these conditions were aggravating Mr. Johnson's mental illness and they did not do anything to attempt to ameliorate that reality. I'd like to turn now to the medical care claim against the Wexford defendants. The record of summary judgment plainly shows that Mr. Johnson's condition was getting worse. That Mr. Johnson's condition was getting worse. He was on suicide watch multiple times and he was severely depressed. But in response to this, for three years, the medical defendants in this case simply tinkered around the edges with his medication, put him on suicide watch and suicide watch and hoped he wouldn't kill himself as he got worse before their very eyes. Ms. McSethy, good afternoon. This is Judge Rovner. In your brief at page 11, note 6, you state that counsel to the Wexford defendants conceded that mental health professionals are intimately involved in the decision whether to impose solitary confinement. But your site for that, your citation for that, is to a deposition of Mr. Johnson. Can you explain how that deposition of Mr. Johnson is a concession by opposing counsel? If that is not the proper site, can you point us to where we would find that concession Yes, Your Honor. And I apologize if that was an error in the briefing and I don't have that particular part of the deposition in front of me. But I can tell you that there are multiple places in this record where we can see that the medical defendants had responsibility for segregation. And I'll just give a few examples here. So first of all, Defendant Moss, you see on two occasions, was part of the disciplinary hearing review committee that imposed segregation and yard restriction on Mr. Johnson. And her signature is on those slips. And if you'd like a cite, Your Honor, that is at ECF 93-14, Act 12 and 13. And we see, again, that Defendant Moss' signature is on these hearing slips. And the inference of summary judgment is that her sign-off was required. And we also see that mental health professionals are the ones who ultimately recommended that his segregation be terminated. And the warden accepted that recommendation that very same day and he was transferred the very next day. So, Your Honor, we would submit that on summary judgment, a rational jury could determine that the medical defendants in this case have responsibility over, have the authority over whether Mr. Johnson is kept in segregation or not. Ms. McDuffie, you have one minute to your rebuttal time. In this one minute, let me just give a couple examples of how we know that the medical defendants knew that their treatment was ineffective. First, we have their own standards which say that in order to determine treatment success, we look to disciplinary reports, frequency of crisis intervention, and complaints filed by patients. Mr. Johnson failed all three. His treatment failed all three. We also see that his condition was worsening and the defendants acknowledged this. And finally, Your Honor, the defendants in this case ultimately conceded that he needed to be transferred and the reason that they gave for transferring him was the same reason that they had given for years to deny him that transfer. And so we would submit that that demonstrates that the medical defendants in this case knew that the treatment was ineffective and simply did not do what they needed to do for three years. And I see that I'm into my rebuttal time, so I'll reserve the rest. Thank you. Mr. Jacobson. Thank you, and may it please the court. Assistant Attorney General Benjamin Jacobson on behalf of State Defendants Appellees. I'd like to start with the discussion that my colleague engaged with, Your Honors, on the specific conditions that were brought up below and the argument about those conditions that's raised here on appeal. If looking to his complaint, Johnson was challenging a series of conditions, including the length of time that he was restricted from having out-of-cell exercise, along with the separate conditions, including unsanitary conditions, the temperatures in the summertime, and the amount of noise caused by other inmates. And following the Supreme Court's decision in Wilson v. Sider and this court's decision applying that mandate, conditions have to be looked at separately. They can only be combined if they have a mutually enforcing effect that produces the deprivation of a single identifiable human need, such as food, warmth, or exercise. So to the extent that my colleague is arguing that Johnson only brought a claim regarding the conditions of his confinement, it would seem that they are abandoning Johnson's additional claims regarding the other conditions. And looking to that specific claim regarding the yard restriction, Pearson, this court's decision in Pearson governs how the court is supposed to analyze the objective element of those conditions. And each imposition of punishment that caused a restriction on an inmate's access to the yard must be analyzed separately to determine whether it was disproportionate to the misconduct at issue. And in Pearson, this court stated that generally a restriction of 90 days or less is going to be constitutional, and that when the inmate engages in violent misconduct, it's reasonable and not disproportionate for the prison officials to impose up to 90 days of restriction for that violent misconduct, which is exactly what we have here, although not all of Johnson. Mr. Jacobson, this is Judge Rosner. Setting aside, you know, for a moment, your argument that the constitutionality of the segregation must be considered separately as to each 90-day stint, is it your position that segregation lasting for 90 days or less is always constitutional regardless of the offense which triggers the discipline? How could an offense such as insolence, for instance, support segregation of any duration? Your Honor, no, that is not our position. As Pearson creates a framework to look at the proportionality of the restriction with the misconduct itself, so inherently under this court's precedent, it's required to look at everything on a case-by-case, restriction-by-restriction basis. And so here, although something like insolence may not be egregious enough to warrant a 90-day restriction, there were various instances where Johnson... Okay. Mr. Jacobson, the district court here, in granting summary judgments, states that... ...insolence, including assaulting a staff member disobeying a direct order, insolence, providing false information, putting on other inmates... ...may be, if not they should be, just as you're not on their case, indicates that Johnson did pose a security threat, if not in segregation. For instance, you know, insolence or providing false information, even impairment of surveillance, if not on their case, indicates that Johnson did pose a security threat. ...that he said what they... ...said it would be a general punishment... ...that he said it would be a general punishment... Excuse me. This is... I have been able to hear for the last several minutes nothing but clicks and pops and echoes. Yes. And the same is true for me. This is Judge Sykes. And that's happening consistently enough now that I think we need to reconnect this call. Sounds like a good idea. All right. If everyone would please hang up and stand by. The clerk's office will be in touch to try to connect this call. And Judge Rovner, we will resume with your question that you were in the process of posing to Mr. Jacobson. Everyone hang up and stand by, please. Okay. We're ready to go. All right. This is Judge Sykes. Do we have Judge Easterbrook? Here. Do we have Judge Rovner? Sort of. Ms. McDuffie? I'm here. Mr. Jacobson? I'm here. And Ms. Stewart? Hello. All right. Let's start again with Mr. Jacobson's argument. And I will start your time now. And I believe, Judge Rovner, you were posing a question to Mr. Jacobson. Would you like to pick up there? I would. I don't know where it left off. But here's my problem. The Department of Corrections defendants argue that Mr. Jacobson's time in segregation was a legitimate response to the security threat that he presented. But when the district court granted summary judgment, the district court stated that Jacobson accrued segregation time for a whole litany of offenses. Many, if not most of those offenses, certainly do not on their face indicate that he would pose any sort of security threat if he wasn't in segregation. You know, for instance, insolence or providing false information, whatever that means. Instead, it certainly seems to me that segregation was used as a general punishment for undesirable behavior. And the amicus brief by the former corrections directors and experts, I thought, very ably established that such an approach is in fact self-defeating in that it creates a much less safe environment for the staff and for other inmates. And the amicus for the professors and practitioners of psychiatry, et cetera, explains that segregation is likely to exacerbate symptoms of mental illness, almost inevitably imposing significant psychological and physiological harm. So the request to break that cycle with the transfer to a mental health unit was rejected repeatedly. I really I really cannot understand almost four years of segregation. It is astounding. So, Your Honor, first, I'd like to address that, at least with respect to Johnson's specific claim, both below and to the extent that they're arguing about the yard restrictions here on appeal. He was challenging the imposition of the yard restriction while he was in segregation, not the use of segregation in and of itself. And if we look to the record and the misconduct at issue here, although not all of it is violent, there were several significant instances of violence, such as assaulting an officer, assaulting two inmates, attempting to assault a third inmate, and intimidating a fourth inmate. And all of this is contained in the record document 93-14 on pages 5 to 7. And the longer impositions of yard restrictions, up to 90 days, were for this more egregious misconduct. Can you explain to me how someone can intimidate someone else if they are allowed out one hour a month? I don't have the specific details of that infraction. Beyond that, I believe he was threatening to kill another inmate. I don't know beyond that, Your Honor. But beyond the objective element of the analysis here, summary judgment was appropriate because the state defendants lacked the reasonable awareness because they reasonably relied on the professional medical assessments of Johnson's health care providers that the alleged condition were not associated with his complaint of ailment. And so to the extent that Johnson is arguing that state defendants were aware of all of Johnson's complaints, there is no debate here. We do not challenge that Johnson made them aware of that both by telling them in person and raising them in his grievances. But that's only the first step of the subjective analysis. It's whether the defendants had awareness and then were deliberately indifferent and ignored that risk. And here, based on this court's precedent, including recently in Giles V. Godinez, where defendants reasonably rely on medical assessments that don't connect the two, they have not been deliberately indifferent. They have just adhered to the division of labor within the prison context between medical experts and prison administrators and security personnel. So you place the onus, all of the onus, on the medical professionals? Is that what you're arguing? Not all of the onus, Your Honor. There are situations where a threat is so obvious. For instance, if an inmate had his arm cut off and the medical professional said that was fine and the state defendants didn't do anything, obviously that's a crime. No, I'm not talking about someone whose arm is cut off. I'm talking about this case. So, Your Honor. Are you placing the onus on the medical professional in this case? At least with respect to identifying when an inmate who is significantly mentally ill or seriously mentally ill, when or not his mental illness is being exacerbated impermissibly. And here, the mental health professionals were visiting Johnson very regularly. Looking at the medical notes in the record, he was seen often once a day, often once a  And he would often be visited in his cell by these experts who can see him in his cell and him raising these complaints about his condition. Where the professionals are saying, are not raising that there is a connection between those conditions and his mental health, it is reasonable for them to defer to that expert opinion. There were seven separate incidents in which he was placed on crisis watch because he was suicidal. Yes, Your Honor, we acknowledge that. Johnson was placed on suicide watch and he was provided the mental health services that he then needed when he was on mental health watch, which is what is then required of the prison officers. They cannot be expected to provide the mental health care themselves. So, they made access to the mental health services and restricted his access to possessions and objects within cells that he could then use to harm himself, which is what's required of prison officers. Like a shelf in order to put his belongings on a shelf? The shelf, I can't speak to that. I know that there were no shelves in these cells. But beyond that, I can't speak to whether or not it would serve as a potential way for him to harm himself. And then, I think unless this court has any further questions, we would rest on our briefs.  Good afternoon, counsel and briefs of court. My name is Lindsay Steward and I represent Wexford and Drs. Scott McCormick, Andrea Moss, Kelly Haag, Linda Duckworth, and Stephen Lanterman, who ask this court to affirm summary judgment in their favor. I would start by addressing Judge Rosener's question regarding plaintiff's brief and affirmatively state that the counsel for Wexford does not in any way concede that the Wexford defendants had any involvement in Mr. Johnson's confinement to segregation or his disciplinary decisions. The plaintiff has consistently pointed to portions of the record and rely on sections 504.20 and 504.60 of the Illinois Administrative Code to suggest that the Wexford defendants have some hand in discipline. However, if you read those codes, it is clear that they do not provide the Wexford defendants with any power to dictate, commute, or otherwise impose or reduce sanctions. You know, you're arguing that the mental health professionals, I take it, didn't have any responsibility for the decision of segregation and yards restrictions other than during the crisis periods. But doesn't the Mental Health Disciplinary Review document at Appendix 295 completed by Andrea Moss indicate that mental health professionals in fact weighed in on that decision with checkboxes for them to indicate whether mental illness contributed to the behavior at issue, whether confinement and segregation is likely to significantly impact the offender's mental health, and whether the offender's mental illness should be considered when imposing discipline up to and including segregation? Why, on summary judgment, should we assume that input, that input, was not an actual part of the decision-making process? The Illinois Administrative Code, Section 504.2, does allow the Adjustment Committee to consider the inmate's mental status and whether the offender issue is related to a mental health diagnosis at the time that they're dealing with a disciplinary infraction. Now, nothing in the Administrative Code requires the Adjustment Committee to take the mental health practitioners' recommendations or assessments into consideration when they impose those restrictions. And nothing in the Administrative Code gives the mental health professionals an ability to override the decision of the Adjustment Committee. There's no evidence in this record that any of the main defendants in this case were members of that Adjustment Committee. The only evidence in this case is that when asked to do so, Andrea Moss, she's the only defendant who appeared on any of these forms in the record, did do what she was asked to do and explain whether she felt the infraction issue such as disobeying a direct order was related to the inmate's mental health. What the Adjustment Committee does with that information, she has no control over. And nothing in the record before this court says that she does. In fact, Mr. Johnson explains this best in his own deposition at pages 20-21 and I believe 82-83 where he explains as a part of her job as a mental health professional, she can provide the Adjustment Committee with that information. But he also explained that she's not on the Adjustment Committee and has no authority acting unilaterally to give him yard time or take away yard time. To the extent that plaintiff is also suggesting that the Wexford defendants had some hand in imposing segregation, I would also say that those arguments have been waived because they were not raised before the district court. They were not pleaded in plaintiff's original complaint and therefore they were not at issue at the time of summary judgment. Turning briefly to the claims of deliberate indifference to Mr. Johnson's mental health needs, I would assert that this record is inconsistent with deliberate indifference. The record on appeal demonstrates that during the three years and five months at issue in this lawsuit, Mr. Johnson had more than 125 contacts with mental health providers, including psychiatrists, psychologists, licensed counselors, social workers. His medication regimen was adjusted 20 times to meet his changing and evolving needs. And Mr. Johnson admittedly engaged in routine therapy and counseling sessions with his assigned counselor, Andrea Moss. Treatment of conditions like bipolar disorder and depression can be challenging in any setting. And this is certainly true in prison. The treatment of mental health disorders cannot be likened to a broken bone or a bleeding finger. And plaintiff's argument ignores the specifics of Mr. Johnson's care. And it's telling that Johnson does not detail the specifics of his mental health treatment or even attempt to set forth the involvement of the individually named defendants on appeal. It is well known that it can take time to determine the right mental health medication regimen for a specific patient. And I would argue that this is not a case like Reno versus Daly, where defendants continue to push a single medication despite objective evidence it was not working. Each time Mr. Johnson's mood deteriorated or when he was placed on crisis watch, he met with a psychiatrist who reviewed and adjusted his medication. And the record shows that on each of those occasions, he was an active participant and agreed with a new treatment plan. Mr. Johnson tried on eight different medications during the time at issue in this lawsuit. Some of those medications were stopped because Johnson reported side effects. Some were stopped because he refused to consent to blood draws required to monitor the level of the medication in his blood. Could you address the decision to refuse Johnson's repeated requests to be transferred to the mental health unit, which would have removed him from the conditions that were exacerbating his mental illness and would have provided more intensive residential mental health treatment? Sure. The record on appeal shows that Johnson made two specific requests to be transferred to a higher level of care, one in the fall of 2015 and one in the spring of 2016. I would point out that Mr. Johnson was tried on different medications, including Lamital, which he was stable on for 17 months without any need for crisis watch or suicidal ideation. Most of the time, Mr. Johnson was described as coherent, logical, goal-oriented. His thought processes were cogent. At the time that Mr. Johnson was requesting in the fall of 2015 and the spring of 2016 to be transferred to the mental health unit, at those times he had also reported that he had stopped taking his medication. He was refusing interaction with his therapist and he was not participating in counseling sessions. Andrea Mott and Dr. McCormick contemporaneously noted in their record that they believed that Johnson needed to show that he could take advantage of the mental health options available to him before a higher level of care would be warranted. As this court explained in Zayas v. Sous, where a medical professional provides a cogent medical explanation for a treatment decision, the plaintiff should point to some evidence that would permit a reasonable jury to reject that explanation as a post hoc rationalization. Would seven suicide attempts be that sort of evidence, you think? I would point that the record doesn't show seven active suicide attempts. Mr. Johnson was placed on crisis watch nine times during this period of time, but not each of those were for a suicide attempt. Some were for a variety of reasons, including Johnson stating that he wanted to move south or that he wanted to socialize and get off of the gallery he was currently on. Ms. Stewart, your time has expired. Thank you. Thank you. Ms. McDuffie, rebuttal. Thank you, Your Honors. I just have three points on rebuttal. First, I'd like to respond a bit to Judge Easterbrook's question earlier about the amount of out-of-jail exercise that is necessary. And I'd like to point the court to the Illinois Administrative Code, which says that offenders in segregation status shall be afforded the opportunity to recreate outside of their cells a minimum of eight hours per week. What Mr. Johnson got in this case was, at best, one hour a month. And the evidence in the record is that he was even denied that small respite for at least a year and a half or almost a year and a half of that time. Before you proceed off the issue of the yard restrictions, if you would take them one at a time, recognizing that we don't evaluate them in the aggregate, but individually under our case law and the Supreme Court's case law. Thank you, Your Honor. So the first one, after his arrival at Pontiac, was imposed for an assault on staff. That was in April of 2013, and that was a three-month restriction. Is it your contention that that was unconstitutional? So, Your Honor, I have a few responses to that. First, to decide this case, this court does not need to decide exactly when the constitutional violation began. That is for a jury to decide. But we would submit that looking at each punishment individually does not work here. And that's because denying out-of-jail exercise to a seriously mentally ill prisoner is the kind of punishment that cannot be disaggregated because it disregards the cumulative nature of the harm. Out-of-jail exercise, as has been acknowledged by this court, by the IBOC's own mental health protocol, and by the defendants in this case, is required in order to manage serious mental illness. And so the longer that that deprivation goes on, the more serious that deprivation is. And so we would submit that looking at this, this is not the kind of case where the court can analyze each restriction individually. And getting back to my second point on rebuttal, just in terms of the method of evaluation here, it's not the case that, at a certain point, the continued imposition of yard restriction became unconstitutional. Your Honor, a jury can certainly… Or is it? So we would submit, Your Honor, that a jury on this record could find that the first imposition was constitutional, or the jury could find that it became unconstitutional at a certain point in the three-year period. But the question for this court is whether a jury, no rational jury, could determine that the entirety of what Mr. Johnson experienced was constitutional. And we would submit that a rational jury can determine that that was unconstitutional on this record. And I'd like to correct something that my colleague said earlier. There is absolutely no evidence in the record, and the IDSC defendants did not argue in their brief, that Mr. Johnson ever threatened to kill another inmate. And if this court looks at the document that my colleague cited, that's at 9314, what that shows is a long history of a violation far, while inappropriate, far less severe than threatening to kill anyone. And finally, with my remaining time, I'd just like to address the responsibility of the defendants in this case. So what we have here is two groups of defendants who are pointing the finger at each other. And I'd like to point out that at summary judgment, what that does is that actually creates a three-way dispute. And so we would argue that where there's Mr. Johnson's story, and supported by evidence in the record, that both sets of defendants are responsible. And then when there are two sets of defendants saying that the other one is responsible and that they're not, that that is not a situation in which summary judgment is appropriate. And we would submit, Your Honors, that the record does show that both groups of defendants are responsible. And I'll just give a couple of examples in my remaining time. Actually, you don't have any time remaining. Your time has long since expired. So you'll have to wrap up now. Thank you. Thank you. And our thanks to all counsel. The case is taken under advisement.